# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**UNITED STATES OF AMERICA**
        **Plaintiff,**

v.                                                                                    **Case No. 11-CR-62**

**SHAWNTE CRAIG**
        **Defendant.**

## SENTENCING MEMORANDUM

Defendant Shawnte Craig pleaded guilty to conspiracy to distribute 5 kilograms or more of cocaine, contrary to 18 U.S.C. §§ 841(a)(1), (b)(1)(A), & 846, and I set the case for sentencing. In imposing sentence, the district court must first calculate the defendant's advisory sentencing guideline range, then determine the ultimate sentence under all of the factors set forth in 18 U.S.C. § 3553(a). See United States v. Panice, 598 F.3d 426, 441 (7th Cir. 2010).

## I. GUIDELINES

Consistent with the agreement of the parties, I adopted a base offense level of 32 based on a drug weight of 5-15 kilograms of cocaine, U.S.S.G. § 2D1.1(c)(4), with reductions of 2 levels under the safety valve provision, § 2D1.1(b)(16),[1] and 3 levels for acceptance of

---

[1] Under the safety valve provision, the court may sentence the defendant in accordance with the advisory guidelines without regard to any statutory minimum sentence if (1) the defendant does not have more than 1 criminal history point; (2) the defendant did not use violence or credible threats of violence or possess a firearm or other dangerous weapon in connection with the offense; (3) the offense did not result in death or serious bodily injury to any person; (4) the defendant was not an organizer, leader, manager, or supervisor of others in the offense; and (5) not later than the time of the sentencing hearing, the defendant has truthfully provided to the government all information and evidence the defendant has

responsibility, § 3E1.1, for a final offense level of 27. Defendant fell in criminal history category I, producing an imprisonment range of 70-87 months under the sentencing guidelines.

## II. SECTION 3553(a)

### A. Sentencing Factors

Section 3553(a) directs the court, in determining the particular sentence to be imposed, to consider:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the [advisory] sentencing [guideline] range[;]
>
> (5) any pertinent policy statement . . . issued by the Sentencing Commission[;]
>
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> (7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

After considering these factors, the court must "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." Id. The guideline range serves as the starting point and initial benchmark in

---

concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan. 18 U.S.C. § 3553(f); U.S.S.G. § 5C1.2.

2

making this determination, Gall v. United States, 552 U.S. 38, 49 (2007), but the district court may not presume that a guideline sentence is the correct one, Nelson v. United States, 129 S. Ct. 890, 892 (2009), and remains free to impose sentence within statutory limits based on appropriate consideration of all of the factors listed in § 3553(a), Pepper v. United States, 131 S. Ct. 1229, 1241 (2011).

**B.    Analysis**

The government recommended a sentence at the low end of the guideline range, while defendant requested a sentence of probation.[2] On consideration of the arguments of the parties, I found a period of confinement necessary to satisfy the purposes of sentencing, but that the unusual offense circumstances and defendant's positive personal characteristics supported a term substantially below the guideline range.

**1.    The Offense**

Following his arrest on a drug charge, an offender on federal supervision, George Woods, agreed to cooperate with law enforcement, advising agents that he obtained cocaine from "Rony," later identified as Evelyn Flora, and an individual from Waukegan, Illinois known as "J" or "Bro," later identified as defendant. Agents staged a series of controlled calls between Woods and Flora, during which Woods ordered 5 kilograms of cocaine, which "Bro" was to obtain. On March 14, 2011, Woods and Flora arranged for delivery, with Woods identifying the car Flora and defendant used to make cocaine deliveries. An officer conducted a traffic stop for speeding and excessive window tint; defendant was identified as the driver and Flora the

---

[2]Because defendant pleaded guilty to a class A felony, probation was not available. See 18 U.S.C. § 3561(a)(1). However, I could have achieved the same basic result by imposing a sentence of 1 day, or time-served, followed by a term of supervised release.

passenger; and both were arrested. With the help of a drug detecting dog, agents found a hidden compartment containing five bricks of cocaine weighing a total of 5011 grams.

In post-arrest statements, Woods and Flora indicated that defendant made five or six previous deliveries, in amounts ranging from 1 to 5 kilograms, in February and March 2011. Defendant admitted two prior deliveries to Woods, of ½ and 2 kilograms, respectively, for a total of 7 ½ kilograms. The parties agreed that a reasonable estimate of the drug weight was 5-15 kilograms, which I adopted under the guidelines.

### 2. Defendant's History and Characteristics

Defendant was thirty-six years old, with a prior record consisting of two cases from his teen years, neither of which involved drugs. He reported a terrible early childhood, which was discussed in detail in the pre-sentence report. (PSR ¶¶ 48-50, 56-57; see also Def.'s Sen. Mem. Ex. B-4.) At the age of three he was placed in foster care and eventually adopted by Runette Craig, and although money was tight things seemed to get better for him. Ms. Craig, now in poor health, remained supportive, stating that defendant was a devoted son who helped everyone in the family. He took her to the doctor, did her grocery shopping, and picked up her medication. Several siblings also made positive statements to the PSR writer, and I received numerous positive letters from friends and family attesting to defendant's good character, importance to his family, and generous nature. (Def.'s Sen. Mem. at 7-11, Ex. B.)

Defendant had a son of his own, age five, and seemed quite involved in his life. The boy's mother described defendant as a great father; he provided for the child financially and guaranteed that he had health insurance. Defendant also spent time with her three girls from a previous relationship and acted as a father figure to other young people in his extended family.

### 3. Defendant's Explanation for the Offense

Defendant appeared to have no substance abuse issues; he graduated high school, compiled a solid work record, and avoided gang associations, all of which begged the question as to why he would get involved in cocaine trafficking, particularly at this level.[3] In his version of the offense to probation and in his proffer session with the government, defendant stated that he got involved to try to save his nephew, Mike Miller, known as "Mike-Mike." He indicated that Mike-Mike's mother, a cocaine trafficker named Shannon Shaw, had an outstanding debt to some Mexican drug dealers, who had threatened to kill Mike-Mike if she failed to pay.[4] Defendant stated that following Shaw's arrest in February 2011 he agreed to deliver Shaw's remaining cocaine, with the proceeds going to repay Shaw's drug debt to save the life of Mike-Mike. Based on post-arrest reports, it appeared that the case agents were aware of this situation and had heard of the threat to Mike-Mike based on Shaw's debts.[5]

Defendant elaborated on this claim in his sentencing memorandum and in court, stating that at the time of her arrest Shaw had 7 remaining kilograms of cocaine she needed to get rid of to pay the drug debt. Defendant stated that Shaw left the drugs in his car, which he allowed her to use, and he then delivered the cocaine to Flora, who was selling drugs to Woods; the money was going to be passed on to pay Shaw's drug debt; he was not to profit. Defendant claimed that he would not have been involved in this offense if not to save the life of his nephew. He pointed out that Flora first met defendant during a discussion with Shaw regarding

---

[3] Woods and Flora indicated that defendant charged $33,000 per kilogram of cocaine.

[4] Mike-Mike's father is defendant's cousin's, Ricky Miller.

[5] The agents apparently heard of the threat from Flora.

5

her drug debt. Defendant attached to the memorandum portions of police reports and post-arrest statements corroborating this version (Def.'s Sen. Mem. Ex. A), as well as the results of a polygraph in which the examiner found that defendant truthfully stated that he delivered the cocaine to pay a drug debt for Shannon Shaw, that the total amount of cocaine he gave Flora and Woods was 7 ½ kg, and that Shaw left 7 ½ kg in his vehicle prior to her arrest (Def.'s Sen. Mem. Ex. D). He further noted that the government deemed his proffer statement sufficiently truthful and complete to support the safety valve.[6] If the drugs indeed came from Shaw, this would explain how someone with no previous involvement in drug trafficking could obtain this much cocaine.

I raised some questions about this version of events at defendant's original sentencing hearing, continuing the matter and inviting the parties to submit further information. The government filed a supplemental memorandum with several attached debriefing statements on the issue. On review of those materials and the entire record, I accepted that defendant was motivated, at least in part, by a desire to help pay off Shaw's debts due to this threat. However, the record also contained evidence suggesting that defendant was involved in drug trafficking before Shaw's arrest in February 2011, which cast his claim as to motive in a somewhat different light. Specifically, both Shaw and her associate Damien Roe stated that defendant provided Shaw with cocaine going back to 2010. The government did not seek to attribute any additional relevant conduct to defendant from the pre-February 2011 period, and

---

[6]As noted above, in order to qualify for the safety valve, the defendant must truthfully provide to the government all information and evidence he has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan. U.S.S.G. § 5C1.2(a)(5).

6

there were reasons to doubt Shaw's claims given her shifting stories.[7]  The government never connected defendant to Shaw prior to Shaw's arrest, and the record contained no hard evidence that defendant distributed cocaine to anyone prior to February 2011.  Defendant further noted that he underwent foot surgery in June 2010 and thereafter spent weeks in a boot and cast, a fact unmentioned by Shaw and Roe in their claims of dealings in 2010.  On the other hand, defendant's possession of a car with sophisticated trap compartments, which he knew how to operate, cut against any claim that he was new to this.  The government did not know when the compartments were installed, although Shaw apparently used the car before her arrest.

Ultimately, I found it unnecessary to definitively resolve the question of when and why defendant got involved, for even if defendant had been motivated solely by the threat to Mike-Mike, it would not justify a sentence of no imprisonment.  There are obviously better ways of responding to such a situation, like calling the police.

**4.     The Sentence**

The guidelines recommended 70-87 months' imprisonment, but I found that a sentence substantially below that range would suffice.  First, while the offense involved a significant amount of cocaine, the circumstances of defendant's involvement were somewhat unusual.  I accepted that he acted, at least in part, to pay off a drug debt which was threatening the life of his nephew, not out of a profit motive or even because of his own drug problem.  Cf.

---

[7]In earlier statements, Shaw apparently denied previous drug dealing with defendant, and the government did not affirmatively endorse her latest claim.  The government continued to support a relevant conduct amount of 5-15 kilograms based on the February-March 2011 period.

7

U.S.S.G. § 5K2.11 (lesser harms); U.S.S.G. § 5K2.12 (coercion and duress).[8] Defendant did not supply the drugs, which apparently came from Shaw, and he did not stand to profit if the money was going to pay off her debt. I declined to go further and make any finding that he was new to drug trafficking – the evidence was insufficiently clear to make a finding one way or the other – but there was sufficient evidence of a mitigating motive regarding the conduct before me. While defendant obviously made a poor decision, under these circumstances his conduct seemed less blameworthy than in the typical drug case with this type of weight. A below guideline sentence sufficed to provide just punishment under § 3553(a)(2)(A).

Second, I considered defendant's positive personal characteristics, including his ability to do well despite his difficult upbringing, as reflected in the many letters. (Def.'s Sen. Mem. Ex. B.) It likely would have been easy for defendant to become bitter and give up on a pro-social life, but he had not done so. I also considered defendant's importance to his family, particularly his adoptive mother and his brother, as well as his son, which no one seemed to dispute. (See Def.'s Sen. Mem. Ex. C.) Defendant's prior criminal record was very limited, nothing since 1994, and he compiled a solid employment history. I did not see a need for significant confinement to deter defendant or protect the public from further crimes under § 3553(a)(2)(B) & (C).

Under all the circumstances, I found a sentence of 18 months sufficient but not greater than necessary to satisfy the purposes of sentencing. This sentence accounted for the mitigating offense conduct factors, defendant's positive personal qualities, and his importance

---

[8] Departures are obsolete after Booker, but the court may still look to the guidelines' departure provisions in imposing sentence under § 3553(a). See United States v. Guyton, 636 F.3d 316, 319 n.2 (7th Cir.), cert. denied, 132 S. Ct. 132 (2011).

8

to his family, while still providing a sufficient measure of punishment and deterrence to others who may be confronted with similar circumstances. The sentence varied substantially from the guideline range, but given the unusual features of the case it created no unwarranted disparity. See United States v. McGee, 479 F. Supp. 2d 910, 913 (E.D. Wis. 2007) (stating that disparity between sentences is "unwarranted only if the judge fails to provide sufficient reasons for the difference, grounded in the § 3553(a) factors").

## III.  CONCLUSION

For these reasons and those stated on the record, I committed defendant to the custody of the Bureau of Prisons for 18 months. Based on his financial situation, I determined that he lacked the ability to pay a fine and so waived the fine. Upon release, I required him to serve 3 years of supervised release, a term sufficient to ensure monitoring and legitimate employment. The conditions of supervised release, and other terms of the sentence, appear in the judgment.

Dated at Milwaukee, Wisconsin, this 3rd day of December, 2011.

/s Lynn Adelman
_____
LYNN ADELMAN
District Judge